Good morning. May it please the court. My name is Matt Crotty and I have the honor of representing Jodie Kelley in this very important case. Ms. Kelley was a five-year employee of Amazon.com from 2006 to 2011. She worked as a customer service representative on the company's search and rescue team. And what that means is when a customer called and had complaints and a lower-level employee could not resolve those complaints, then those complaints were elevated to Ms. Kelley. One of Ms. Kelley's supervisors, Susan Myers, describes her as smart, talented, and of unlimited potential. Ms. Myers described Ms. Kelley's strengths as one that works with customers until the problem is resolved. From 2006 to 2009, Ms. Kelley received positive performance reviews, promotions, and pay raises. In mid-2010, after raising concerns about her disability with her employer, Ms. Kelley was placed on a series of what are called step plans. Those step plans ultimately led to what the company describes as her termination. Well, since you don't have a lot of time, and I think we're very aware of the facts, how can we conclude that Kelley is qualified to perform the essential functions of a customer service advocate when she failed to meet Amazon's customer service satisfaction requirement over a course of at least eight months, even after Amazon implemented four consecutive step plans? I'm going to start by talking about the job description for the search and rescue associate, and that's at document ER-482. And that document describes the customer service associate as one who recovers the customer experience. So that's a criteria of the job. And then the second criteria is somebody who thinks outside of the box. Now, in the record, there are three unsolicited customer compliments, not complaints, but performance. And those are documents 279, 281, and 282. But most importantly, on July 6th, 2010, Ms. Kelley's supervisor, Ms. Myers, signed a document in which, let me step back, Ms. Kelley requested a promotion. In order to compete for that promotion, she needed a promotion slip signed by her supervisor, Ms. Myers. Ms. Myers signed that slip, and it is document 288. And Ms. Myers writes as follows, Jodi is focused and determined to find resolution for customers' issues. She has a great ability to think outside the box and find resolution that others have missed. This recommendation, July 6th, was written six days before she was placed on her first step plan for excessive EDR. Right. I guess the problem seems to be not that you couldn't find individual instances of praising her, but I gather that Amazon uses this expressed dissatisfaction rate, right, the EDR, as a measure of, and they basically ask customers, are you satisfied with your experience? And if your client's EDR is higher than the team's average, that's where the problem begins. So, I mean, looking at that, what's wrong with that statistical use as a measure of whether the customer service associate is doing a good job or not? First, Amazon no longer uses the EDR. But second, when the EDR was in place, documents 302 and 306, when Ms. Kelly was on the performance improvement plan, her supervisors were listening in on our calls and giving her free feedback. And two, and the record, and again, documents 302 and 306 reflect that in listening to the calls, the customers said that they were satisfied with Ms. Kelly's performance, but her service, but still clicked no, no on the EDR survey, because in one case, and I believe this was in the February 2011 timeframe, shortly before her termination, the seller, not Ms. Kelly, refused to respond to the customer's calls. Put simply, sometimes the EDR was based on instances simply outside of Ms. Kelly's control. Does that answer your question? Well, it still does, but they have this, but other people are obviously meeting that, were meeting that standard at the time. So, the fact, they're not saying you have to be 100%, you know, successful, but they allow for this, you know, percentage, and then they say how they add in a 10% and they do certain things, how they calculate it, and so that there's a lot of people that meet the EDR requirement, and she didn't. She did at times, in early February 2011, shortly before she was terminated, her EDR was 1.27%. And then also the record reflects that as February 2011 wore on, she was coming off of some narcotics, and in early March, March 4th, 2011, she went to the emergency room, and then was terminated six days later. On March 3rd, the day before she went to the emergency room, the records reflect that her tone was what was getting better. And in late February 2011, the record further reflects that she was, I believe the quote is, on the right track. So, the company was listening to her on the phone. Customers were not saying, you know, we don't like you, we don't think you're doing a bad job. There were simply things under Ms. Kelly's control. But again, there were times, even as late as February 2011, when her EDR was below the then 4.5%. Right, but from the time of the step plan in July of 2010 until her termination, her EDR was below 4.5%. That's what the EDR says, yes, Your Honor. But in December 2010, she was off the EDR plan, only to go back on it in February 2011. But before she went back on it in February 2011, additional documentation was submitted to Amazon, again informing Amazon of her migraines, endometriosis. Is there any proof in the record of any disparate treatment in the sense that others with equally, let's say, unfavorable EDR rates were kept on when your client was terminated? I have not seen that in the record, but nor have I seen any evidence from Amazon showing that... Well, any burden of disparate impact or disparate treatment would be on you, not on Amazon, would it not? Well, correct, Your Honor. But as far as the disparate treatment under the Washington law against discrimination, all I have to show, and this is different from the ADA, all I have to show under the Washington law against discrimination is that her disability was a substantial or motivating factor, which is different from the but-for causation of the ADA. So if I can establish that her tone, for example, which her doctor does relate to her disability, was a factor that Amazon took into consideration in terminating her, then that establishes her burden under the Washington law against discrimination. Well, but her tone goes to whether she's qualified to do the job, doesn't it? You still have to show she's qualified to do the job with accommodations, right? I do, and I believe the record supports that. Again, we have three customer compliments about Ms. Kelly's performance, and then two document internal emails from Amazon, both in the mid-2011 time frame, which, in monitoring her telephone calls, say that... What's your contention about that? Do they, to accommodate Kelly, do they have to change the use of EDR to track performance of customer service? Is that what, what's the accommodation? Or is your argument that Amazon could have reasonably accommodated Kelly by reassigning her to another team, but I don't see, where in the record does it indicate the availability of other positions that she was qualified for? One accommodation that we ask for, and this is supported by the Kim Brovers Atlantic Richfield case, is simply a leave of absence. Again, in February 2011, the record reflects that she's coming off of the narcotics, so a leave of absence, and she had additional FMLA time available just to allow her to get better. So that's one accommodation. Another accommodation, she worked from home, remotely, and she could have been transferred to a chat team or a Kindle team where she could have interacted with customers online vis-a-vis over the phone. So those are two accommodations. Does the record show that there was a position available that she could have transferred into? Amazon says no, but it's our contention that Amazon didn't look because Amazon never entered into the interactive process, even though it was unnoticed to do so. But if Amazon says there was no available, if there's no available vacancy to which she could be transferred, how can you just say that's not credible? I mean, isn't it your burden to come back with something to show that there was a vacancy? At a point in the case, yes, Your Honor. But at this point, there is evidence that other individuals had been transferred to the Kindle team in the past. But also, had Amazon entered into the interactive process, which they didn't with regard to Ms. Kelly's disabilities, then that would have been a time for both parties to see if she could be transferred to such a position. What's your argument regarding what a leave of absence would have done that the medical leave and the hours of limitation accommodation didn't accomplish? What would a leave of absence have accomplished that was not accomplished by giving her time off and limiting her hours of work? With February 2011, again, she's going off of the narcotics that she declared to in her declaration, and it's culminated with that emergency room visit on March 4th. And so if you look at her pain going up, her EDR failure rate was also going up at that time. So allowing her time off could have flattened out and then lowered that. But she could have allowed her time off whenever she asked for it. So did she ask for a leave of absence? In the late February 2011 time frame, no. She didn't because the company fired her. That was March. March 10th, within a short. But she'd been having this problem for the last eight months. I mean, with the whole leave. So coming off narcotics wouldn't account for her unfavorable EDR rate for eight months. That is a possibility, Your Honor. But she was still on some narcotics even earlier. There's a October 2009 request for medical information document from the physician which shows that the narcotics she was on made her both loopy and tired. So she was on those narcotics throughout the duration of her, at least from October 2009 onward. Did she inform Amazon of this? She did. It's in the request for medical information document that Amazon requested. And that's document number 460. That's the medical slip that Amazon... What's the date of that? October 6, 2009. And what was her reason for submitting that? Is that just to get time off? To get intermittent FMLE to FMLA to deal with her migraine. Okay. So how do you respond to that? How does that put someone on notice that someone's requesting accommodations? Under the Washington Law Against Discrimination, the standard and it's set out in the Holland v. America West and then the Downey v. Crowley Marine cases, both cited and emphasized in our reply brief, that does it. It's simple notice, meaning notice of a disability. And under the Goodman v. Boeing case, contrary to what the district court ordered, it's not incumbent on the employee to inform the employer of the whole continuum of the employee's disability. So that's more notice than actually was even allowed in the Holland v. America West case. In that case, the employee had two brief conversations with his boss saying, hey, my anxiety is affected by the night shift, whereas here we have at least three... But at least that linked the disability to the job. And again, on summary judgment under the real case, the real business fund maker, we have the declaration of Ms. Kelly's physician that links the tone with her endometriosis and... That links the what? That links her tone, her poor tone with her endometriosis and migraines. And it makes sense too, if you have a migraine, you're... Was that part of the notice? Are you saying that was the notice that an accommodation was needed? No, that's the evidence that we put forward to attempt to survive summary judgment. Right, but I was speaking in terms of the notice. I thought that's what Judge Callahan was asking you, whether or not that's notice that an accommodation is required. And again, I'll just go back to the notice from 2009 about the narcotics she was on, the FMLA notice of both October 27th, 2010 and January 2011. Also referenced that she will need intermittent leave for migraines and endometriosis. Did they ever deny her intermittent leave? No, they did not. All right, counsel, you've exceeded your time. We'll give you a minute or two for rebuttal. Thank you, Your Honor. Thank you. Good morning. Good morning. May it please the court, counsel, Janine Blatt appearing on behalf of defendants, who I will collectively refer to as Amazon. With me today is Amazon's client representative and assistant general counsel, Kurt Walters. Jumping right to the chase, since there's not a lot of time, do you concede that Amazon did not engage in an interactive process to explore accommodations to help Kelly? No, I do not. And this is why. They explored accommodations for the limitations that it had received notice about. And those limitations were that she was unable to work when these episodes occurred. And she asked for intermittent leave. They fully accommodated that. They gave her intermittent leave. They gave her continuous leaves under FMLA. They gave her continuous leaves that weren't protected by FMLA when she asked for them. And then she asked for eight-hour days on two occasions. And they fully approved those and accommodated those requests. And these are all things she asked for and she received. She put them on notice. They fully accommodated. They were not on notice that there was a problem, there was any problem with that. Those were accommodations to help her with the attendance and showing up for work. They had no notice that there was an issue there. So counsel says that the disability that should have been accommodated related to her tone of voice, related to her migraines and the pain she was suffering. What's your response? That they did not... Ms. Kelly never gave notice to Amazon that she was in pain talking to customers, that that pain affected her tone of voice, and that for that reason she could not give appropriate assistance to customers. There's... And she admitted to the district court that she didn't give that notice. There is... She admitted to the district court that she did not give notice regarding the pain resulting in perhaps an inappropriate tone. Where can we find that in the record? It's in the record. It's in... It's in Supplemental ER 68, the hearing before the district court, where the district court specifically asked her if she had ever let her supervisors know that her conditions were the cause of her performance failure. And she told the district court, no, she hadn't. And that's the... 68, what line is that? I'm on page 68. Okay, it starts... It starts on the bottom of page 67, line 25, and the question goes through line 9. And the answer then is on line 10. So how's that part of the summary judgment record? It's an admission to the district court that she didn't provide... The district court's asking her questions in court? Yes. This was the hearing before the district court, and the court asked her counsel on this... And this is what he said, and this is what he asked. So is it she's answering or her lawyer's answering? Her lawyer. Her lawyer is admitting that the record does not reflect that she gave any notice to the district court, or to Amazon, that she needed help interacting with customers. She said she admitted. So you meant her lawyer on her behalf admitted? Yes. Well, that's different than in a deposition, obviously. She didn't... Well, I'm just saying don't be loose with the words, because we're... And I apologize, I guess... I mean, Judge Wallinson was asking you where in the record, and usually people would cite to the deposition of the individual where you were questioning and saying, did you ever give notice of X, Y, and Z? But, you know, what your lawyer says, I'm not saying that couldn't be some sort of admission, but it's not Miss Kelly talking. No, it's her counsel admitting that the record does not have any evidence. That's a different point, though. Correct. But in her deposition, and to answer your question, what she was asked in her deposition is if she had asked for anything other than what was reflected in the EEOC questionnaire that she submitted to the EEOC in support of her claim. And that is in the record. The EEOC questionnaire is ER 342. But the question I asked her in her deposition was what was it that she specifically asked about of human resources at Amazon. And what she told me was this. She had a conversation with Miss Wilson about my EDR and taking a look into the way it was calculated based on the call volume I was taking in. And then I asked her if that was all she asked about, and she said yes. And if you look at ER 79 and ER 80, those are the answers to those questions. Well, it's a little bit hard to, though, if you say, you know, how can we conclude that Amazon was not on notice that her disabilities were causing performance problems given that Amazon knew that she was taking, was missing eight days of work per month due to her disabilities? I mean, that's a lot of time. Because what if, I mean, what are we talking about, that you work 20 days a month and she's missing eight? Almost half? And there's no record. The law does not require Amazon to make that assumption. It's incumbent on the employee to tell the employer  and that they need help for that limitation. What she did, and then the medical certifications don't tell Amazon that she has a problem performing her work. If you look at ER 459, or actually it's first ER 446, and that's a certification of leave for intermittent leave for migraines, and there's a question on that form. And the question says, if she's able to perform some work, is the employee unable to perform any one or more of the essential functions of the employee's job? And her physician said, that's not applicable. So the physician's telling Amazon when she has these conditions, she can't work. She doesn't need accommodations at work because she won't be there. Then she fills out another form, her physician, and it's ER 459. And the physician says that she can return to work with no limitations. And there's actually a section on that form that if they have limitations, work limitations, the physician can note those. And it actually includes talking on that form. And it's not checked because the physician is saying she can work without limitations. She missed these eight days a month. Was that all day or just part day? Both. They were both. So I guess maybe in response to, I asked appellant's counsel that how can we conclude she's qualified to perform the essential functions of customer service when she failed to meet all the PIPs or the steps or whatever's going on. But then I'm learning there that you don't do that anymore. I probably couldn't, honestly, I probably couldn't keep this job. That in terms of I'm sure that when you get the most unhappy customer people, it's pretty, you know, there's some people that if we got surveyed after court, we'd probably get a bad survey every time from the person that lost. That, you know, that's the, so. Your Honor, the law under the ADA is clear that the employer has the right to set its performance standards. And it's not for the court to tell the employer that its standards are wrong. If there were evidence that other people weren't meeting it and got capped, that would be a different story, right? Or if no one met the standards except for, and they got to keep their jobs, but that she didn't. There is no evidence of disparate treatment. In fact, the admissions through the statement of facts and the depositions are that this standard was applied uniformly to all customer service agents in the same job. And Ms. Kelly did not provide any evidence that they treated anybody more favorably with respect to EDR. But I want to say this case is very similar to the issue that was involved in Samper v. Providence St. Vincent Medical Center. And in that case, Ms. Samper challenged the ability of my client, Providence, to enforce a uniform attendance standard that it used to measure whether the nurse was regularly showing up to perform her job, which was an essential function. Here we're using EDR to measure whether customer service agents are providing the high level of customer service that they are expected to provide. It's the same thing. And there they said that the employer is not expected to lower or adjust its performance standards. The difference, and it makes this case even less compelling than Samper, is that there's that lack of notice that the performance problem is related to her medical conditions. In Samper, it was clear that she told, hey, my fibromyalgia is not letting me meet this attendance standard and you should adjust it. We don't have that connection here. But it's also incorrect that they don't use a measurement standard for customer service anymore. Two years after Ms. Kelly's discharge, they went from express dissatisfaction rate to negative response rate. So they still have a measurement standard that all customer service associates are supposed to meet. The obligation under the ADA for accommodation is to accommodate known limitations. It was incumbent on Ms. Kelly to tell Amazon that she needed help interacting with customers because of her disabilities. The EEOC and its guidance has made clear that when you're addressing performance problems with an employee, the onus is on the employee to tell you that they need help to meet those standards because of their limitations. They're in the best position to know what they need. Here, Ms. Kelly can't even say for sure that her problems with customers were related to her medical conditions. At best, she says, well, they might have been. And she tries to say that it's limited to her tone. But there were other issues that were going on. She wasn't going above and beyond to find solutions for the customer. She was rushing customers off the phone. She wasn't apologizing for mistakes. There was just a whole host of things. And one manager even said that she came across as hostile and unfriendly. Well, that apparently is what Ms. Jones characterized as this concept of tone. I mean, she came across as unapologetic, distracted, short, uninterested, uncaring, and rushed. Those are all just other words for tone. Correct. I mean, they are. But she also didn't go above and beyond to find solutions. That's also in there. What about either this Kindle team or the chat team? Those also required interaction with customers. The Kindle team, there's no evidence in the record that anybody was transferred to Kindle when they had a customer service EDR problem on another team. Kindle had its own EDR rate, which was lower, a lower percentage than the customer search and rescue associates. Amazon gave them credit for the fact that that job may be a little bit more difficult sometime because you might have a crankier customer. So they had a more lenient standard. Kindle team had a lower standard. Well, a higher standard of satisfaction, I guess, or whatever. Correct. And there's nothing in the record that shows that frustration from Kindle customers is any less than, I mean, if I can't get my Kindle to work, I'm not necessarily the happiest customer either. So that's a speculation. There's no evidence in the record that Amazon had a policy of doing that, that they didn't follow with Ms. Kelly. There's no evidence in the record that that would resolve her performance issue. And therefore, it was Ms. Kelly's obligation to come forward with assuming that we failed an interactive process, which we did not. But if we had, then it was Ms. Kelly's obligation to show that reasonable accommodation was possible. And she failed to do that. One accommodation that had been suggested was that Amazon should have consulted with Ms. Kelly's doc. They had no idea that that was something that her performance issues were caused. She didn't tell them, hey, my performance issues are related to my medical conditions, please call my doctor. An employer can't just call an employee's doctor and say, hey, can you give me information on this employee, until they know or have been asked by the employee for help. And there's no evidence in the record, they said that about a leave of absence helping Ms. Kelly. Unlike in Kimbrough, unlike in Humphrey, where the, Humphrey they actually had a physician that said a leave of absence may help with her OCD. There's no evidence in the record, and there was no argument made before the district court, that a leave of absence would actually help improve Ms. Kelly's condition, which was a longstanding condition that had been going on since 2007. There's no evidence that that leave would have helped resolve that, so she could come back and perform and provide the high level of customer satisfaction that Amazon required. I'm almost out of time, and I just want to specify, what makes this case different is there's no request for accommodation. There's no information provided to the employer that the job is worsening Ms. Kelly's health condition. Ms. Kelly didn't tell them that her performance problem was linked to her medical conditions. Those are all facts that are in the cases that are relied on by plaintiff, and they are not present here. The district court correctly found that there was no genuine issue for a jury to decide on these claims and properly dismiss them. Thank you. Thank you, counsel. Let's have two minutes for rebuttal. Thank you, Your Honor. I'll touch on the notice argument again. Amazon argues that Kelly never gave notice, and Kelly needed to tell Amazon about the link between the performance problems and her medical condition. Practically speaking, Jody Kelly is not a doctor. But legally speaking, it was not Ms. Kelly's burden to provide such notice, and I base that off of the Washington State Supreme Court case of Goodman versus Boeing, 127 Washington 2nd, and it's page 408. And there the State Supreme Court says, under the Washington Law Against Discrimination, again, different standard than the ADA, an employee does not need to explain the full nature and extent of her disability. Right, but there has to be some indication that the asserted disability has a nexus to the job or the job performance. That's where the interactive process comes into play, and to make that link, I want to direct the court to document number 298. That is Amazon's... What page on the excerpt to record are you referring to? 298. And that's, tell you, it's Amazon, it's a policy, and it's a guide to shift bid special requests. And I want to direct you to the bottom of that policy. Essentially, if an employee comes in and says, I need to miss work for whatever reason, the policy initially gives the employee's manager the option, well, some guidance. But then the policy goes on to say, if the employee is requesting time off of work because of a medical reason, then the policy says that the company will engage in the interactive process. And again, that's towards the bottom of that policy. And here, the company knew that Ms. Kelly had migraines and endometriosis, but never engaged in the interactive process. And I want to define interactive process. The problem is there's not that link. Even though they knew she had migraines and endometriosis, there wasn't the link between, this is why my tone of voice is affected when I'm with customers. I think that's the missing link that they were not aware of. Because they accommodated her. They gave her a leave. They gave her the work hours that she wanted. And so I don't think that the evidence points toward the fact that they knew that there was a link between her asserted disability and her decreased job performance. But had they entered into a dialogue instead of, hey, here's the sheet that says I get this time off, and given her the time off, but had they sat down and spoken with her and said, Ms. Kelly, we know that you have migraines and endometriosis. We've been monitoring your calls. We know that there's problems with your tone. Given what you've told us already about your disabilities, could you go back to your doctor and see if this tone is related? It's kind of a chicken and egg argument. Do you have to have notice before you engage in the interactive process, or do you engage in the interactive process to get the information that you need? That's kind of a dilemma. Well, again, the Washington State Supreme Court, under the Washington Law Against Discrimination, answers that question. It's simple notice, notice of the disability, and then the employer enters into the good faith dialogue, meaning here are the essential functions of your job, one of which is using your experience to retain the customer service experience. And the company could sit down with Ms. Kelly and say, you know, this is what we need you to do, ensure the customers are happy. We see that there's problems with your tone. You've let us know that there are these disabilities. Is there a link? And then Ms. Kelly, who's not a doctor, can then take that to her doctor, and the doctor can make that assessment, which he did in this case. Don't you think the form that you referred us to, 298, says that the employee must first advise the employer of the accommodation request and then the interactive process begins? Could you read that last paragraph that you were referring to? HR will evaluate all special accommodation requests and advise management accordingly. No, I thought page 298 of mine starts, the last paragraph starts with then. You're right, Your Honor. I misunderstood the sentence to paragraph. I apologize. Then the CSM must advise his HRBP of medical disability or religious accommodation requests from their team as soon as they are received. What is that sentence saying? Doesn't it say that you have to receive an accommodation request? Yes. In this case, the accommodation request was time off relating to migraines and endometriosis. Which were granted. As to time off, but still, as her tone was getting worse, the company was on notice and interactive processes continuing obligation. That's not what it says. It says they must advise of medical disability or religious accommodation requests. In this case, the requests that were presented by the employee were honored. Actually, the policy says the CSM, that means the customer service manager. The manager advises HR. Of requests that are received. The request has to be received by the manager from the employee before it's given to HR. Correct. But once HR gets the request, then to constitute the good faith interactive process, HR should go directly to the employee and speak directly to the employee because, again, just a piece of paper. I think we're talking past each other because the record does not reflect that the particular request that you are saying should have triggered more accommodation was made. That's where I think we're missing the connection. Because I just don't see in the record where the request to accommodate the tone of voice implication was made. That's what I think your problem is with your case. And, again, I'll just refer the court back to the Goodman v. Boeing case where the employee does not have to, under the Washington Law Against Discrimination, again, a different, easier standard than the ADA, the employee does not have to advise the employee of the full nature and extent of the disability. Again, it's just simple notice. All right. Please wrap up, counsel. Unless you have any other questions, Your Honor, I'll... All right. Thank you, counsel. Thank you to both counsel. The case just argued is submitted for decision by the court. The next case on calendar for argument is the Boy v. Colvin.
judges: Gilman, Rawlinson, Callahan